The next case, number 23-1443, Amgad Sameer Haleem Khalil v. Merrick B. Garland. At this time, would counsel for the petitioner please introduce himself on the record to begin? Yes, please, of course, Your Honor. I'm the petitioner. Okay, you may proceed. Thank you, Your Honor. My brother, Tony Bebba, is going to argue the issue of nexus. I'm going to focus on the rest of the brief, if I may. Okay. Let me ask you, you divide your time five minutes each. Are you going to reserve a minute or anything for rebuttal or no? No, Your Honor. Okay, go ahead. Thank you, Your Honor. This is a case about a Coptic Orthodox Christian who grew up in Egypt, and obviously he was an active member, not just a simple member of the community. He was subjected to attacks on his way to church, and when the issue that stemmed his reason to flee the country, which is a blood result when he was working as a technician, came up with pregnancy result of a young woman who was Muslim. Her father was an imam. Imam is the leader of the Muslim community at that time. He asked him to cancel that result, diminish the result. He refused. As a good person, he refused to obey that, knowing what's going to happen. Next, people are attacking him and telling him to convert to Islam and beating him and using the slogan, Allahu Akbar, and the beating kept intensifying as he goes along and continued to refuse. The IJ, number one, misstated some facts. She said, he's not an imam, without any explanation. Just out of the blue, she came up with that statement. The judge said he was not injured by throwing rocks. He was injured by throwing rocks, and even if he was not injured, just we have to understand how difficult it is for us to go to the place of worship, the place of comfort, with a great fear every single time that people are throwing rocks at us. Didn't the immigration judge not find your client credible? There was a finding of not credibility. The issue of the credibility, the judge was silent at the very end on saying he is not credible. That by itself, according to the law, that means he is credible. She actually specifically declined to make a finding one way or the other, correct, counsel? Exactly. And that entitles you to a presumption of credibility on appeal? That's quite correct, Your Honor. And again, the many issues in this case, I'll try to focus on one of the cases that was decided by this court in 1994. When the Muslim Brotherhood gained control of the country, many cases by the BIA, which I cited there on page 39 of my brief, it says cases were reopened. And after that, we don't understand how the BIA deviated in contradiction with the Villa Verdelas in 1994 that says if the administrative agency has to deviate from a precedent, they have to squarely address it and say why it's reasonable to change that previous decision. What decision do you think they changed, counsel? Instead of now saying all the captive Christians are persecuted, they are very short on saying that. But, counsel, didn't your client have to show either individualized, a risk of individualized persecution or the pattern or practice? And I guess my question for you is it does seem like it's a substantial evidence analysis that we do. So why did the record compel a contrary conclusion to the one the agency reached here on the persecution issue? What is more than people beating somebody up and say convert to Islam, deviate from the religion that you grew up with in order for you to suppress the information that you get from the blood result? Well, I guess on that, I know you're addressing different issues, and I'm trying to respect which issues you're addressing. But on that question, I think the IJ said that would rise to the level of persecution but found no nexus. So I was asking you about the other experiences of harm that your client experienced, the rock throwing, the evidence in the record about general pattern and practice of discrimination. Why does the record compel a contrary conclusion from the one the agency reached on those issues? The country condition all over the place, the religion freedom of religion, has been showing that the Catholic Christians for many years have been persecuted. And that by itself gives the presumption that this person, what he's saying, is telling the truth that he was being thrown rocks at and being injured. If that's not enough to claim persecution, what would be? But we are going to see more information about. Go ahead, please. We'll see through my attorney, Baba, that there is a huge nexus between the attack and applying for asylum. Thank you, Your Honor. Thank you. Mr. Baba? Thank you, Counsel, at this time. If Counsel for the ACLU would please introduce himself on the record to begin. Good morning, Your Honors, and may it please the Court. My name is Julian Baba, and I'll be arguing on behalf of the amici in support of the petitioner. The amici are here to address errors that are typical of how the immigration courts treat asylum claims implicating personal disputes. This Court has often repeated that events stemming from personal disputes generally are not enough to establish the requisite nexus to a protected ground. But the agency has taken those words to mean that whenever an asylum claim is- Counsel, I don't mean to interrupt you at this point, and I'd be happy for you to return to your argument, but are you familiar with our recent decision, Pineda-Maldonado? Yes, I am, Your Honor. Okay, and do you intend to discuss that today? Yes. Thank you. Absolutely. But we submit that the agency has taken those words to mean that whenever an asylum claim implicates a personal dispute, the nexus analysis is all but over. Here, the IJ found that the petitioner was attacked because he would not destroy the pregnancy test results. But the IJ did not consider whether the desire to destroy those results was itself triggered by the belief that as a Christian, the petitioner could not be trusted to keep confidentiality. The agency even nodded to the petitioner's evidence of attempted forced conversion but ultimately decided that this powerful evidence of nexus counted for less simply because that demand was precipitated by a personal dispute. And nowhere did the agency even acknowledge the evidence that every time the petitioner refused that demand to convert to Islam, his assailants grew angrier and beat him again. In fact, the petitioner testified that his family received a threat on his life even after he had fled Egypt and presumably was in no position to destroy those test results. But that fact also fails to appear in the decisions below. The agency's error lies not only in the fact that it ignored key evidence of nexus but also in the reason it ignored that evidence in the first place, a presumption that the presence of a personal dispute in the case absolved the agency of its duty to explain why the petitioner's evidence was not sufficient to establish religion, that religion was at least one central reason for his persecution. But counsel, is that really what the agency did here? Because it seems that what the IJ found was that the religious motive, to the extent there was one, was tangential, which is the analysis that they're supposed to do. Is it tangential or is it a central reason? And she pointed to several facts in the record that made her reach that conclusion. So I think my question for you is, you know, why does the record compel a contrary conclusion? How is this not a substantial evidence issue rather than a legal issue? I think you're trying to give us your best argument for why we should look at it from a legal framework. But I think the IJ here actually understood the legal test and seemed to have applied it but just reached a different conclusion than you would argue for for your client. On whether this is a legal issue, the IJ and the BIA did cite the correct legal test. But we think that they applied something different altogether. By acknowledging only a portion of the evidence that was relevant to the petitioner's nexus claim and then saying that that evidence didn't count only because the events that came before that hospital attack were related to an unprotected personal dispute, that's a method error in the agency's nexus analysis that we think requires de novo review. But on the substantial evidence point, Your Honor, we think that Piniella Maldonado is a very good case and is instructive on that point. There, the petitioner alleged that he received death threats on account of a debt owed by his father, Victor. But the petitioner recounted an incident in which the police detained and beat him and then asked him whether he was Victor's son. And when the petitioner answered that he was, the police beat him even more forcefully. And the court held that it was impossible to disentangle Mr. Piniella's relationship to his father from his persecutor's pecuniary motives and therefore reversed the agency's no-nexus determination. The facts that the court encountered in Piniella are analogous to the situation that the court confronts in this case. Religion was the central reason that the personal dispute as to the pregnancy test results arose at all, and thus the two cannot be disentangled. And each time the petitioner refused to convert during the hospital attack, his assailants beat him again and again. Counsel, you have very little time left and there has been no reservation, so I have a question that is unrelated to what you've been discussing so far. There was an alternative basis, was there not, for finding that there was not a reasonable fear of future persecution, and that was that he had safely relocated to another part of the country. So I have two questions. One, did you address that, not you specifically, in front of the BIA first? And second, what do you say about that alternative basis? I don't recall immediately what the petitioner's counsel said about that issue before the BIA, but I can refer the court to, I believe it's pages 170 to 171 of the administrative record. That's part of the transcript in which the petitioner speaks about the death threats that he received after he had fled Egypt. We think that those are illustrative of, that's illustrative of why the petitioner could not reasonably relocate elsewhere in Egypt. Didn't the IJ also, there's a finding or mention that the family, the wife, and he's got several children, they all remained in Egypt.  That would be subject to the inquiry of whether the IJ's conclusion compels a contrary result. We have not addressed in our brief those factual findings on the well-founded fear issue, but what we have addressed more precisely is the past persecution claim, which if established would create a rebuttable presumption of a well-founded fear of persecution. We can't speak necessarily in more detail to Your Honor's questions about well-founded fear, except to say that if past persecution were established, then it would be the agency's burden, or excuse me, the government counsel's burden to show internal relocation was not feasible. Okay. Any further questions from my colleagues? Just one question unrelated to the merits. I know that Harvard Immigration and Refugee Clinical Program and the ACLU filed a brief. Do they work together? Just out of curiosity. Yes. We do review the petitions for review that come up in the First Circuit to identify important issues of concern. Okay. So it just happens to be a joint brief? Yes, it is. Okay. And you're from Harvard or from the ACLU? From the ACLU, Your Honor. Okay. Thank you very much. Thank you very much. Okay. Counsel for the government, Mr. Harvey Youssef. Mr. Youssef, please introduce yourself on the record to begin. Good morning. May it please the Court. Younal Youssef for the Attorney General. Good morning, Prosecutor. The Court should deny the petition for review. Substantial evidence here supports the agency's determination that the petitioner did not meet his burden of proof for asylum, withholding, removal, or cat protection. In particular focus to the asylum withholding claims, the petitioner did not establish that at least one central reason was a protected ground. Counsel, can I ask you, the petitioner has argued that the nexus determination ultimately for the BIA, not for us, for the BIA, is a legal one. The ultimate question, was there a nexus or was there not, is a legal question, and that the BIA didn't mention de novo review anywhere in its analysis of the nexus issues here. Do you agree that the ultimate question of whether there is nexus is a legal one for the BIA to review de novo? Yes, Your Honor. It's a kind of a bifurcated analysis in terms of, for example, in regards to the petitioner's argument was in terms of the factual finding as to the motive of the persecutor, the BIA reviews that for clear error, and then ultimately whether based on those factual findings, did the petitioner establish that a statutorily protected ground that was at least one central reason is reviewed de novo. But the BIA didn't do the second part here, did it? They didn't expressly state that they were conducting de novo review. They did have language at the beginning saying legal questions are reviewed de novo, but in its ultimate conclusion it stated that. About nexus, it didn't mention de novo review. Not expressly, but it did state that we agree with the immigration judge that the petitioner has not met his burden, that religion played any more than an incidental role in motivating the men in attacking him, and then it cites this circuit's law in terms of the petitioner's burden of showing the unaccounted portion of establishing the requisite nexus. Do you think that's enough to meet its burden to review the ultimate nexus question de novo? I believe so, Your Honor. It does cite the legal standard. It does lay out that the petitioner has to demonstrate a statutory protected ground is at least one central reason and made the legal determination that the petitioner did not do so here. So I think that they did conduct sufficient analysis in providing this court the opportunity to review that determination. And to go to the question of the at least one central reason, I think it is important to kind of take a look at the way that the petitioner presented his testimony before the immigration judge such that it supports the agency's conclusion that the petitioner's belief in a Coptic Christian religion was not at least one central reason. During his testimony, the petitioner testified that he was someone who was identifiable as a Coptic Christian based off the jewelry he wears, he had a tattoo of a cross on his hand, and he is someone that is as identifiable as a Coptic Christian. And that's relevant in the fact that he is also someone who works with Muslims and Christians in his hospital. He treats Muslim and Christian patients and testified he had never had any issues working in the hospital. And the moment the father and the underage daughter come in for the blood test results, who the petitioner identified as an imam, there was no issues between this religious figure and the petitioner. He described that everything was fine. It was only upon discovering that his underage daughter, the blood test results came back that she was pregnant, that the imam, the father of this girl, was pregnant that he went and he became angry, went in a rage against his daughter and demanded that these results be destroyed. And that is when the issues began. That's when the threats began. And also, during this portion of the testimony, the petitioner did not indicate that his religion was invoked at any time. Isn't that because you were cross-examining him and didn't raise it? And the way that the testimony went forward in this case is the government went first and essentially cross-examined the petitioner, right? That's correct, Your Honor, but he made no reference to the imam himself invoking the religion or in any way stating anything against his faith in that regard, despite as he had testified that he was identifiably a Christian man. So the petitioner himself had the opportunity to raise the fact that, oh, he referenced my faith. There was no reference to his faith. And the subsequent incident when he was attacked by those four individuals, the petitioner himself described it as a trap, it was a ploy, in order for those test results to be destroyed. The damaging test results, as the petitioner explains, that this would have been destructive to the reputation of the imam and to his family and to his daughter. So this was the catalyzing central reason, sorry for that language, the primary reason for why he was attacked. And they did invoke his religion when they were attacking him. There's no dispute. The agency acknowledges this. They take note of the fact that he was, they demanded he convert or they called him an infidel. However, the agency correctly concluded that this was tangential to the destruction of those test results. And the petitioner's declaration states as much. At the end of his declaration, he noted that you should have listened to the imam and destroyed those test results. But, counsel, I think what the petitioner is arguing is that the two things, his religion and the personal dispute, the failure to destroy the records, they can't be disentangled. And can you address that, why there wasn't a failure here to look at that? Could you really take these two things apart? Why couldn't they both coexist? Because what the petitioner is arguing is that if he had been Muslim, he would have been treated differently, even if the facts were exactly the same and the test result came back positive. There would have been a completely different sequence of events if he had been Muslim. Because he would have been trusted to keep it confidential, as I believe his argument. Well, I believe that argument is just based on conjecture. There's nothing in the record to support that him being a Muslim would have. Well, there's his testimony, isn't it? And don't we have to presume he's credible on appeal, given the failure to find otherwise by the IJ? That's correct, Your Honor. I think what the record shows here is, I think, as you noted earlier, this is a substantial evidence question. Does the record compel the contrary conclusion to that of the agency? And time and time again, the fact that the test results was why he was being attacked, why the demand he convert was the test result. It always came back to the test result in the record. And I think that's why the agency did look at the religion. There was relevance to the religion, his faith. However, it was incidental to those test results. I think this is the quintessential case in which we apply a central reason standard. It is the fact of there's a protected ground and an unprotected ground here. Was the protected ground a central reason? The agency concluded, based on the record and the evidence presented, it was not. It played a part. It simply was a subordinate incidental part to those test results. And I don't think the record compels a contrary conclusion to that, Your Honor. So I think that the attempt to – they are connected. But the question is, the petitioner here, did he meet his burden in showing that his religion was the central reason for why he was targeted? Based on this record, the agency correctly concluded that the test result here was the primary motive, and the religion was tangential to that. Would you speak to the relocation issue? Your Honor, in specific to the relocation issue, the petitioner did relocate to Giza, I believe, and he was there safe for about two and a half months. And the immigration judge took note of the fact that he wasn't able to avoid harm there. And the board took note of the fact that he was never found, I believe, by the people that targeted him, and so that he was able to. Do you recall in the record whether he raised that issue before the board? I don't recall that he did specifically. The board did note it. If he did not raise it, and as you say, the board noted it, is that enough to keep it in the case? I regret to say, Your Honor, I'm not sure if that would be enough to keep it in the case. Are there any further questions, Your Honor, on this issue of nexus? In regards to the remaining issues regarding the well-founded fear of future persecution, the petitioner did not present sufficient evidence to show that he would be singled out for persecution or that there's a pattern or practice of persecution. And I think, as Judge Helphy noted, his family is currently residing there. I believe his wife and children, his parents, his six siblings, all unharmed, all Coptic Christian practitioners, and none of whom have experienced any harm in their time there, while residing there, undermining any such claim of future persecution on his part. And the government would rest on their briefs in regards to the Catt claim. Can I ask you one question about the Catt claim? Yes, Your Honor. Again, this is a question of the review that the BIA should have conducted. Wasn't the BIA required to conduct a NOVA review on whether the IJ's findings are sufficient to establish acquiescence by the Egyptian government? So again, you know, the facts, the IJ finds, substantial evidence review, but the question of whether the facts found are sufficient to show acquiescence or not, isn't that a legal question for the BIA? The second portion of that is a legal question. Here the board also affirmed the immigration judge's determination that the petition did not establish that he would be more likely than not to be persecuted, sorry, tortured, by or with the consent of the Egyptian government. That was their ultimate conclusion in affirming. In affirming that determination, they found no clear error in the immigration judge's determination as to the role of the government in the harm here. That's what I'm saying. Shouldn't they have looked at the ultimate question, whether the facts were enough or not, de novo, not clear, under clear error review? I think what they saw from the country conditions evidence based on the fact that the government is actually combating, I guess, sectarian violence, Islamic fundamentalists, determined that there was no evidence in terms of factual findings as to no clear error in that determination. And then the general, I think that they ultimately, based off that analysis, concluded that the petition did not meet their burden of proof. Was there a legal determination as to whether or not there was, in fact, acquiescence? I don't think the agency expressly stated that, but their ultimate conclusion, kind of the beginning of that paragraph where they say that he did not, more likely did not provide sufficient basis in denying that claim. But I guess my question is, I just think there's other parts to that analysis which seem to be missing, and that's why I wanted to get your views on it, because doesn't the BAA need to look at, you know, the government's legal duty and how effective their responses have been? And, of course, the petitioner is arguing the responses of the Egyptian government have been completely ineffective, and I didn't see that in the BAA's analysis. So I just wanted to give you an opportunity to respond. Yes, I understand, Your Honor. And I think the agency's analysis wasn't as fulsome as we would have liked, but they did ultimately conclude that the petitioner didn't meet their burden on that issue. They did note that the evidence doesn't support that the government, the role of the government here was insufficiently, they did not sufficiently establish that the government would, based on country conditions evidence, based on them combating this violence, that there was no evidence to support the government role as it were in terms of the factual finding. And I agree, Your Honor, that the analysis needs to be a little more fulsome, but here the agency ultimately concluded, based on the record, that the board ultimately concluded that he did not establish that they were more likely to not acquiesce to his harm. There are no further questions, Your Honor. Thank you for your time. Thank you. You're excused. Thank you, Counsel. Let's call the final case. Thank you. That concludes argument in this case.